UNITED STATES v. CENTRAL PAC. R. CO. et al.

(Circuit Court, N. D. California. April 24, 1899.)

No. 4,119.

PUBLIC LANDS—SUIT TO CANCEL PATENT—MINERAL CHARACTER OF LAND.
    In a suit by the United States for the cancellation of a patent to land issued under a railroad grant, on the ground that the land was mineral, the burden rests on the complainant to overcome the presumption in favor of the patent by satisfactory evidence, not only that the land was known mineral land at the time the patent was issued, but that it is chiefly valuable for mineral purposes. Evidence that gold placer mining had formerly been carried on in a stream on the tract, but that it had been abandoned as worked out prior to the date of the patent, and that neither at that time nor since had there been any mines on the land producing mineral and capable of being worked at a profit, is insufficient, as is also evidence of the mineral character of adjoining land.

This was a suit in equity to cancel a patent to land.

Samuel Knight, Asst. U. S. Atty.

William Singer and H. V. Reardan, for defendants.

MORROW, Circuit Judge. This is a suit in equity brought by the United States against the Central Pacific Railroad Company, as successor in interest to the Central Pacific Railroad Company of Cali-

fornia and the Western Pacific Railroad Company, and several other defendants acquiring interests therefrom, to cancel and set aside a patent issued by the United States on October 12, 1867, to the Central Pacific Railroad Company of California for section 7, in township 16 N., range 11 E., Mt. Diablo meridian, in Nevada county, Cal. Under the act of congress approved July 1, 1862, entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes" (12 Stat. 489), and the act amendatory thereof, approved July 2, 1864 (13 Stat. 356), there were granted to the Central Pacific Railroad Company of California 10 alternate sections of the public lands of the United States, on each side and within 20 miles of the road of said company, designated by odd numbers, and not sold, reserved, or otherwise disposed of by the United States, and to which a homestead or pre-emption claim might not have attached at the time the line of road of said company should be definitely fixed. The section in controversy is an odd-numbered section on one side of the line of said railroad, and within 20 miles thereof. It was surveyed in June, 1866, and the township plat approved by the surveyor general of the United States on October 24, 1866. On June 1, 1867, the said section 7 was included in List No. 4 of selections filed by the Central Pacific Railroad Company of California in the Marysville land office, in the state of California, and on October 12, 1867, a patent thereon was issued to said company, duly signed, attested, and sealed by the proper officers of the United States government. By the acts of congress granting this land to the Central Pacific Railroad Company of California it was expressly provided that no lands should be granted to the said company which were mineral in character, excepting such as contained only coal or iron; and in the patent issued for the said section 7 there is the following clause: "Excluding and excepting from the transfer by these presents all mineral lands, should any such be found to exist in the tracts described in the foregoing, but this exception and exclusion, according to the terms of the statute, shall not be construed to include coal and iron land." It is claimed on behalf of the United States that gold mining had been carried on upon the land in controversy before the issuance of the patent, and that the character of the land was established as mineral other than coal or iron, and was so known to the defendants; that the patent was issued through mistake, inadvertence, and error, and without authority of law; that it is void and of no effect, and should be canceled, and the lands therein described be declared public lands of the United States.

On April 10, 1875, the Central Pacific Railroad Company of California conveyed, in fee simple, all of said section 7 to the defendants Allen Towle, George W. Towle, and Edwin W. Towle, who are now the owners and in possession of the land. The defendants admit that in early days mining was carried on in the bed and along the banks of a creek crossing the upper portion of the section, but assert that it had been abandoned as early as 1858; that the land was returned to the land department as agricultural, was patented as such in 1867, and so considered when purchased by the defendants Towle in 1875;

and therefore they are purchasers in good faith, and their title cannot now be disturbed.

The good faith of the defendants Towle in purchasing the land from the patentee must first be ascertained, and in determining this, as well as the question whether the patent for the land was erroneously granted to the railroad company, the controlling fact to be deduced is the known character of the land at the date of issuance of the patent. The evidence is voluminous, and somewhat conflicting. The burden of proof that the land was "known mineral land" at and prior to the delivery of the patent, on October 12, 1867, is upon the United States. Examining the complainant's evidence, it appears that the section of land in controversy is principally a high ridge, and at the date of the patent was covered with a fine growth of timber. A creek crosses the upper portion of the section, in the bed and along the banks of which mining was profitably carried on in the early days, from 1857 to about 1862, and for some few years afterwards the Chinese mined there. Since then it has been virtually abandoned as worked out. Mining claims have been located which approximately cover the section, but in each claim the lines extend to an adjoining section, and it is a noticeable fact that the only development or exploitation of these claims is outside of section 7. There appears to be a channel of gold-bearing gravel running through some of the contiguous land, but this fact cannot, of itself, give the land in section 7 a substantial mineral character, unless the section itself contains land valuable chiefly for its gold-bearing mineral. As was pertinently said by the supreme court in Davis' Adm'r v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628: "There are vast tracts of country in the mining states which contain precious metals in small quantities, but not to a sufficient extent to justify the expense of their exploitation. It is not to such lands that the term 'mineral,' in the sense of the statute, is applicable." So as to the land in question. Particles of gold have been found by the various prospectors in different parts of the section, but the evidence does not prove the existence of a deposit of sufficient value to justify the expenditure of time and money for its extraction. Even up to the date of taking testimony in this case, in 1887, no mines of any value appear to have been discovered or developed within the section. There is a marked unanimity of opinion among the authorities that, to overcome the presumption that a patent to public lands was issued upon sufficient evidence, clear and convincing proof must be produced, and, in the consideration of the mineral character of the land, not only must it satisfactorily appear that it was known mineral land other than coal or iron at and prior to the issuance of the patent, but it must be more valuable for mineral than for agricultural or other purposes. Deffeback v. Hawke, 115 U. S. 404, 6 Sup. Ct. 95; Iron Silver Min. Co. v. Mike & Starr Gold & Silver Min. Co., 143 U. S. 394, 430, 12 Sup. Ct. 543; U. S. v. King, 27 C. C. A. 509, 83 Fed. 188; Alford v. Barnum, 45 Cal. 482; U. S. v. Iron Silver Min. Co., 128 U. S. 673, 9 Sup. Ct. 195; U. S. v. Marshall Silver Min. Co., 129 U. S. 588, 9 Sup. Ct. 343. "If upon the premises at that time [when title was acquired] there were not actual 'known mines' capable of being profitably worked for their product, so as to make

the land more valuable for mining than for agriculture, a title to them, acquired under the pre-emption act, cannot be successfully assailed." Colorado Coal & Iron Co. v. U. S., 123 U. S. 328, 8 Sup. Ct. 131.

The folly of excluding so-called "mineral land" from agricultural or other purposes, when it has ceased to yield gold in paying quantities, and has no appreciable value in minerals, is discussed by Judge Deady in U. S. v. Reed, 28 Fed. 482. With regard to their known character, he says:

"The statute does not reserve any land from entry as a homestead simply because some one is foolish or visionary enough to claim or work some portion of it as mineral ground, without any reference to the fact of whether there are any paying mines on it or not. Nothing short of known mines on the land, capable, under ordinary circumstances, of being worked at a profit, as compared with any gain or benefit that may be derived therefrom when entered under the homestead law, is sufficient to prevent such entry."

It may be observed, further, that the claim of the government that the patent in this case was issued through mistake, inadvertence, and error does not appear to be supported by the rulings of the interior department as to what constitutes mineral land. In the case of Dughi v. Harkins, 2 Land Dec. Dep. Int. 721, Secretary Teller, in disposing of a contest between mineral and agricultural claimants, where the land was returned as agricultural by the surveyor general, expressed the following opinion as to proof of the mineral character of the land:

"This land was returned by the surveyor general as agricultural in character, and hence was subject to a homestead entry. In such case the agricultural character of the land continues until its mineral character is satisfactorily shown. * * * The burden of proof is therefore upon the mineral claimant, and he must show, not that neighboring or adjoining lands are mineral in character, or that that in dispute may hereafter, by possibility, develop minerals in such quantity as will establish its mineral rather than its agricultural character, but that, as a present fact, it is mineral in character; and this must appear from actual production of mineral, and not from any theory that it may produce it. In other words, it is fact, and not theory, which must control in deciding upon the character of this class of lands. Nor is it sufficient that the mineral claimant shows that the land is of little agricultural value. He must show affirmatively, in order to establish his claim, that the mineral value of the land is greater than its agricultural value."

The land decisions teem with opinions of this character by the successive secretaries of the interior, and are of persuasive force in determining a question so peculiarly within the jurisdiction of that department. The present owners appear to have purchased the land from the railroad company on account of the valuable timber then upon it, and have since cut a large portion of it, and converted it into marketable form at their sawmills. There is no conflict in the testimony as to the extent or value of the timber at the date of the patent, and the evidence, as a whole, is not sufficiently strong and convincing to prove the land chiefly valuable for its mineral. A decree will be entered in favor of the defendants.